JIMMY LEE HARRIS,

        Plaintiff,

     v.                                  Case No. 20-C-695

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION

Plaintiff Jimmy Lee Harris, who was previously determined to be disabled and received social security disability income under Titles II and XVI of the Social Security Act, filed this action for judicial review of a decision by the Commissioner of Social Security terminating his benefits. The Commissioner found that Plaintiff was no longer disabled as of July 1, 2015, and that he had not become disabled after that date. Plaintiff asserts that the decision of the administrative law judge (ALJ) finding that Plaintiff was not disabled is flawed and requires reversal for a number of reasons. For the reasons that follow, the Commissioner's decision will be affirmed.

## BACKGROUND

On April 13, 2007, an ALJ determined that Plaintiff was disabled beginning March 26, 2002. R. 431. The ALJ found that Plaintiff's severe impairments included headaches and handcuff neuropathy of the bilateral wrists with weakness despite surgical intervention and that the impairments resulted in Plaintiff's inability to perform a 40-hour competitive workweek secondary to hand use restrictions. R. 423–27.

The agency conducted a continuing disability review (CDR), and on July 9, 2015, it was determined that Plaintiff was no longer disabled since July 1, 2015. R. 436. After Plaintiff requested reconsideration, a state agency disability hearing officer upheld the determination. Plaintiff subsequently requested a hearing before an ALJ. On May 8, 2019, ALJ Walter Hellums conducted a hearing where Plaintiff, who represented himself, and a vocational expert (VE) testified. R. 105–33.

At the time of the hearing, Plaintiff was 45 years old and lived in a single-family home with his thirteen-year-old and six-year-old daughters. R. 116. He stated that his five-year-old son lived with the child's mother. *Id.* Plaintiff completed the eleventh grade and obtained a cosmetology degree. R. 108. He testified that he had not worked since 2007, even though he had reported income of $131.00 from Dots, LLC. R. 112–13.

Plaintiff reported that he spends his day taking care of his children by picking them up from school and cooking for them. R. 115–16. He stated that he drives to doctor's appointments, the children's schools, and the grocery store but avoids long drives. R. 116–17. Plaintiff testified that his fiancé comes over and completes the household chores. R. 117. She also occasionally helps him to dress and bathe. R. 119. Plaintiff testified that he managed the family finances. Plaintiff reported that, in March 2018, he had reinjured his shoulder after an altercation with the police. R. 113–14. He testified that he had multiple surgeries on his left shoulder and had one surgery, with another scheduled, on his right hand due to his bilateral handcuff injury. R. 120. The ALJ advised Plaintiff that he was concerned about how well Plaintiff is functioning and whether he can work or not. R. 128. Plaintiff testified, "I'm disabled. And that's the only thing I have to say. If I was able to work, I would have been out there holding two or three jobs." R. 129.

In a seventeen-page decision dated May 29, 2019, the ALJ concluded that Plaintiff's disability ended on July 1, 2015, and that Plaintiff has not become disabled again since that date. R. 80–96. The ALJ's decision followed the eight-step evaluation process for Plaintiff's Title II claim and the seven-step process for the Title XVI claim. R. 81. The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the date of his decision. R. 82. The ALJ determined that, since July 1, 2015, Plaintiff has had the following severe impairments: left shoulder palsy with scapular winging (status-post surgery), lumbar degenerative disc disease, status post bilateral wrist injuries, and degenerative joint disease of the hips and sacroiliac (SI) joints. *Id.* The ALJ also noted that Plaintiff had a number of non-severe impairments. Next, the ALJ found that, since July 1, 2015, Plaintiff has not had an impairment or combination of impairments that meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and that medical improvement occurred on July 1, 2015. R. 86–87. The ALJ noted that, since July 1, 2015, the impairments present at the time of the comparison point decision (CPD), or the April 13, 2007 decision, decreased in medical severity to the point where Plaintiff is able to perform a full range of light work as defined by the Dictionary of Occupational Titles (DOT). R. 88. The ALJ explained that Plaintiff's medical improvement related to the ability to work because it has resulted in an increase in Plaintiff's residual functional capacity (RFC).

The ALJ found that, although Plaintiff has continued to have a severe impairment or combination of impairments since July 1, 2015, based on the current impairments, Plaintiff is able to perform light work as defined by the DOT with the following additional limitations: "he is able to occasionally reach overhead with the left, non-dominant upper extremity." R. 89. The ALJ concluded that, since July 1, 2015, considering Plaintiff's age, education, work experience, and

RFC based on the current impairments, Plaintiff has been able to perform a significant number of jobs in the national economy, including photocopy machine operator, inspector hand packager, and electrical accessories assembler. R. 95–96. The ALJ determined that Plaintiff's disability ended on July 1, 2015, and Plaintiff has not become disabled again since that date. R. 96. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the

4

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every

5

piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

**A. Severe and Non-Severe Determinations**

Plaintiff asserts that there is no basis for the ALJ's severe and non-severe findings. The determination of whether an alleged impairment is severe is essentially a "de minimis" screening device that allows the SSA to increase "the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). If no severe impairments are found, the case ends with a denial of the application. But if the ALJ determines that the claimant has at

6

least one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. In this case, the ALJ found that Plaintiff had severe impairments including left shoulder palsy with scapular winging (status-post surgery), lumbar degenerative disc disease, status post bilateral wrist injuries, and degenerative joint disease of the hips and sacroiliac joints and continued on with the sequential evaluation to address and evaluate all of Plaintiff's impairments. In short, the ALJ's finding was not insufficient so as to require reversal.

**B. Credibility**

Plaintiff asserts the ALJ improperly assessed the limiting effects of his symptoms. The Social Security regulations set forth a two-step process for evaluating a claimant's statements about the symptoms allegedly caused by his impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of his pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR 16-3p. "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*,

7

529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539. "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester*, 920 F.3d at 510.

Plaintiff asserts that the ALJ used improper boilerplate language in making his credibility determination. The Seventh Circuit has recognized that "[t]he fact that the 'ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester*, 920 F.3d at 510 (quoting *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013)). The ALJ's use of boilerplate language in this case was not problematic because the ALJ discussed the substantial evidence that supports his decision. Plaintiff also maintains that the ALJ failed to indicate which statements he found were not credible, but an ALJ is not required to specify which of the claimant's statements were not credible. *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that the ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability").

In this case, the ALJ noted that, since July 1, 2015, the impairments present at the time of the CPD decreased in medical severity to the point where Plaintiff is able to perform a full range of light work as defined by the DOT. R. 88. He explained that, in making this finding, he did not consider the limiting effects of the impairments that Plaintiff developed after the CPD. As of Plaintiff's CPD, Plaintiff had two severe impairments: headaches and bilateral wrist impairments, secondary to injury. The ALJ noted that, Plaintiff made no mention of headaches or wrist

8

symptoms during his testimony and instead focused on his left shoulder injury, which the ALJ observed as a newer injury. After reviewing the evidence in the record regarding Plaintiff's headaches and wrist impairments, the ALJ concluded that the evidence reflects "considerable improvement since the 2015 cessation" and that, based solely on consideration of his CPD impairments, Plaintiff remains physically capable of light work. R. 89.

The ALJ nevertheless noted that Plaintiff continued to have a severe impairment or combination of impairments and considered the limitations and restrictions imposed by the combined effects of Plaintiff's medically determinable impairments. R. 90. The ALJ determined that the treatment record itself, while reflective of some symptoms supporting the light residual functional capacity adopted, fails to indicate the symptom severity or degree of limitation alleged. The ALJ noted a 2005 examiner concluded that Plaintiff had bilateral upper extremity complaints that did not follow an anatomic distribution and were of an unclear etiology. He observed that, despite presenting with his hands in a flexed state and denying much ability to pinch, Plaintiff presented with full range of motion in his fingers, thumbs, and elbows. R. 92. The ALJ commented that, in April 2015, Plaintiff demonstrated some decreased sensory response in his right wrist and markedly decreased sensation in the left upper extremity and that, at this point, his left shoulder injury was also affecting his left upper extremity. The ALJ noted that, subsequently, Plaintiff's complaints have mainly focused on other physical issues. Specifically, Plaintiff has additional severe impairments including a left shoulder condition, lumbar degenerative disc disease, and bilateral hip and SI joint degenerative joint disease. *Id.*

The ALJ stated that, even as of 2005, Plaintiff was complaining of back and left hip pain. The ALJ noted that a lumbar film would eventually reveal mild degenerative disc disease with mild straightening of the lumbar spine, that cervical and thoracic films were grossly normal, and

9

Case 2:20-cv-00695-WCG    Filed 09/24/21    Page 9 of 20    Document 39

that there was evidence of mild degenerative joint disease in the hips and SI joints. As to other objective findings, the ALJ recognized that a 2013 MRI revealed post-surgical changes to the left shoulder; a 2013 EMG was positive for old left long thoracic neuropathy without signs of acute denervation; a 2015 EMG continued to reflect incomplete left long thoracic nerve palsy, improved since previous imaging; a 2015 x-ray indicated mild left shoulder degenerative joint disease; and a 2016 MRI reflected an intact rotator cuff repair with mild degenerative joint disease. He also considered the treatment Plaintiff pursued and any noted response. In particular, the ALJ observed that Plaintiff pursued some physical therapy for back and hip pain, underwent left shoulder scapula surgery in 2016 in light of left shoulder serratus anterior palsy with scapular winging, and pursued some occupational therapy after surgery. *Id.*

The ALJ found that, even with Plaintiff's combined physical issues, including lumbar degenerative disc disease, bilateral hip and SI joint degenerative joint disease, a history of bilateral wrist injuries, and, most predominantly, his left shoulder impairment, physical exam findings have remained fairly good, consistent with the ability to perform light work. He noted that, in April 2015, Plaintiff presented with decreased sensation in both wrist and hands, markedly on the left, he grimaced and had pain behaviors during lumbar testing, and his gait was very slow and cautious. *Id.* The ALJ observed that diagnoses included his left shoulder scapula condition and right neuropathy, that the latter had not been corroborated by testing, and that left shoulder and spine pain were also noted. R. 93. The ALJ indicated that these findings were influenced by significant somatic overlay. A mental evaluation would corroborate somatoform disorder with observed symptom exaggeration. The ALJ recognized that providers indicated sciatic and myofascial pain involvement with regard to left shoulder and back complaints. The ALJ noted that, since 2015, Plaintiff has generally presented with intact motor strength, range of motion, and sensation. The

10

ALJ stated that, while Plaintiff has, at times, presented with antalgic gait and a cane, the record lacks frequent treatment for falls, evidence of a substantive syncope impairment, or documentation of a balance-related impairment. In addition, there have been observations of normal gait, without mention of an assistive device, and recent findings include good hip, knee, ankle, and foot motion, strength, and stability. *Id.*

As to Plaintiff's left shoulder, the ALJ noted that Plaintiff has demonstrated some decreased range of motion in the left shoulder, with noted difficulty raising his left upper extremity overhead, consistent with his shoulder impairment. The ALJ observed that Plaintiff has demonstrated full range of motion in his left elbow, wrist, and digits and that left grip has been observed as only slightly reduced at 4/5. The ALJ indicated that Plaintiff's right shoulder range of motion has been normal and that full range of motion in both shoulders was observed in 2018, albeit prior to another arrest that reportedly aggravated his left shoulder condition. *Id.* The ALJ noted that recent exam findings have generally reflected intact motor strength, only slightly reduced in the left upper extremity and left hip. *Id.*

The ALJ concluded that, while Plaintiff has developed new physical conditions, on review of the evidence as a whole, Plaintiff has, since July 2015, remained physically capable of light work with occasional overhead reaching with his left, non-dominant upper extremity. *Id.* Plaintiff asserts that the ALJ did not consider the ample evidence that showed Plaintiff's shoulder condition remained consistent and resistant to treatment. More specifically, Plaintiff asserts that "the ALJ admitted that he had not reviewed a substantial amount of medical records that Harris had submitted ahead of his May 8, 2019 hearing." Pl.'s Br. at 9, Dkt. No. 22 (citing R. 111). At the hearing, the ALJ indicated that he did not get a chance to go through the approximately 150 pages of records that were submitted days before the hearing. R. 111. Even though the ALJ was unable

11

to review the new records before the hearing, there is no indication that he did not consider the records before issuing the decision. The ALJ admitted the evidence into the record and stated in his decision that he considered the evidence in rendering the decision. R. 80.

Plaintiff further argues that the ALJ did not consider occupational therapy records from mid-2017 or the medical assessment form completed by his treating physician, Dr. David Kornreich on December 6, 2018. *See* R. 2. Plaintiff submitted this evidence to the Appeals Council after the ALJ issued his decision. The Appeals Council found that the new evidence did not show a reasonable probability that it would change the outcome of the decision. *Id.* Because this evidence was presented to the Appeals Council after the ALJ issued his decision, the ALJ cannot be faulted for failing to consider it. Plaintiff does not assert that the Appeals Council erred in declining to review his case. In sum, the ALJ thoroughly discussed the objective evidence and Plaintiff's treatment history.

The ALJ also properly found that the medical opinions did not substantiate Plaintiff's allegations or require the ALJ to include additional limitations in the RFC assessment. Plaintiff asserts that the ALJ gave "no basis" for the "selective and haphazard way" the ALJ credited the medical opinions. Pl.'s Br. at 9. The ALJ decided Plaintiff's case under the revised regulations regarding the assessment of medical evidence. Under the new regulations, an ALJ is not required to give any specific evidentiary weight to any medical opinion. 20 C.F.R. § 404.1520c(a). Instead, the ALJ focuses on the persuasiveness of medical opinions and prior administrative medical findings by considering the following factors: supportability, consistency, the relationship with the claimant, specialization, and other factors. § 404.1520c(c)(1)–(5). The regulation explains that supportability and consistency are the "most important factors" to consider. § 404.1520c(b)(2).

12

In other words, the ALJ must discuss supportability and consistency of an opinion but is not required to discuss the other factors.

In this case, the ALJ properly evaluated the medical opinions. The ALJ found the administrative findings of state agency consultant Dr. Pat Chan "largely persuasive." R. 94. Dr. Chan completed a physical residual functional capacity assessment on June 23, 2016. R. 986–94. Dr. Chan opined that Plaintiff could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand and/or walk about six hours in an eight-hour workday, and had limited ability to reach in all directions (including overhead). R. 987–89. The ALJ concluded that the evidence since the July 2015 cessation is consistent with and supportive of Plaintiff's ability to perform light work with a left upper extremity overhead reaching restriction. R. 94. The ALJ noted that Dr. Chan's findings were largely, rather than fully, persuasive because Dr. Chan neglected to specify to what degree Plaintiff could engage in left upper extremity overhead reaching, indicating only that the action would be limited. *Id.*

The ALJ found the administrative findings of state agency consultant Dr. Mina Khorshidi not very persuasive. Dr. Khorshidi completed a physical residual functional capacity assessment on June 23, 2015. R. 821–28. She opined that Plaintiff could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand and/or walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and was limited in his ability to reach in all directions, handle, and finger. R. 822–24. The ALJ explained that Dr. Khorshidi's findings are considerably inconsistent with and unsupported by the evidence as a whole. R. 94. He noted that, while Dr. Khorshidi correctly appreciated Plaintiff's ability to perform light work, consistent with generally good physical exam findings despite underlying mild degenerative arthritis and bilateral upper extremity impairments, Dr. Khorshidi additionally endorsed left handling, finger, and

feeling limits inconsistent with the record. The ALJ explained that Plaintiff has demonstrated full range of motion, even in the left elbow, wrist, and digits, and that his motor strength has been grossly normal, only slightly reduced in the left, non-dominant hand. The ALJ also reasoned that Dr. Khorshidi endorsed a hazard restriction, which is not supported by the record. The ALJ concluded that Dr. Khorshidi's administrative findings are overly limiting and considerably inconsistent with and unsupported by the evidence since the July 2015 cessation. *Id.* Although Plaintiff asserts that the ALJ did not "award any credibility" to Dr. Khorshidi's assessment, Pl.'s Br. at 9, the ALJ is not required to award "credibility" as part of his evaluation of medical opinions. The ALJ provided an adequate basis for his finding that Dr. Khorshidi's opinions were not very persuasive.

Plaintiff further maintains that the ALJ did not "support or justify his refusal to give State agency consultant Dr. King any sort of credibility and his finding that he was 'generally unpersuasive.'" Pl.'s Br. at 17. Dr. Kyla King opined that Plaintiff had mild limitations in his activities of daily living and in maintaining concentration, persistence, or pace and moderate limitations in maintaining social functioning. R. 839. The ALJ concluded that Dr. King's findings were generally unpersuasive because the evidence is "simply not consistent with or supportive of more than mild mental limitations in functioning." R. 86. The ALJ created a logical bridge between the evidence and his conclusions, and substantial evidence supports his decision. In short, the ALJ did not err in evaluating the medical opinion evidence.

The ALJ also considered reports of evasiveness, exaggeration of symptoms, and feigning of difficulty during testing with normal abilities noted in separate reports. He observed that examiners noted apparent ability to provide information when he chooses and ability to answer correctly when pressed. R. 91. In particular, the ALJ noted that Dr. Richard Ertl, a consultative

14

examiner, cited "evasiveness, exaggeration and feigning difficulty during cognitive testing." R. 85–86. The ALJ also cited a physical exam report that indicated significant somatic overlay response influencing Plaintiff's presentation. R. 91. The ALJ concluded that, overall, the reports suggest a substantive volitional component to Plaintiff's presentation and performance during exams as well as with respect to Plaintiff's self-reports regarding symptoms. *Id.* Plaintiff asserts that the ALJ erred in misinterpreting Dr. Ertl's report. But during his June 14, 2015, consultative examination, Dr. Ertl noted that Plaintiff was "difficult to interview" and "often appeared unwilling to provide frequencies, durations, and time frames of symptoms he reported." R. 816. He also observed that Plaintiff "often spoke in generalities and at times seemed to exaggerate his symptoms and limitations." R. 816–17. Although Dr. Ertl concluded he could not say that Plaintiff was malingering, he noted that Plaintiff "appeared evasive when asked for details about his medical problems" and "appeared to feign difficulty at times during mental status examination." R. 818. The ALJ did not err in relying on Dr. Ertl's observations and other reports of exaggeration and feigning of difficulty during examination when assessing Plaintiff's symptoms.

The ALJ next considered the statements offered by Plaintiff's fiancé, Charita Simms. Plaintiff asserts that the ALJ erred in assessing the credibility of Simms. The ALJ found that, while her statements largely corroborate Plaintiff's assertions, the evidence as a whole, especially the underlying objective findings, failed to indicate the symptom severity or degree of limitation alleged. R. 91. The ALJ considered the statements and properly weighed their evidentiary value along with the other evidence in the record. *See* 20 C.F.R. § 404.1529(c). That is all that is required.

Plaintiff also argues that the ALJ improperly evaluated his activities of daily living. While an ALJ must consider the claimant's daily activities as one of the factors in evaluating intensity

15

and persistence of pain, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). An ALJ cannot place "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006). Here, the ALJ did not equate Plaintiff's ability to perform certain activities of daily living with an ability to work full time. Instead, he used his reported activities to assess the credibility of his statements concerning the intensity, persistence, or limiting effects of his symptoms. *See Pepper*, 712 F.3d at 369 ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability.").

In this case, the ALJ properly relied upon Plaintiff's admitted activities to assess his statements concerning the intensity, persistence, and limiting effects of his impairments. The ALJ noted that, with respect to his daily functioning, Plaintiff's admissions reflect somewhat less intense, less persistent, and less limiting symptoms than generally alleged. He explained that Plaintiff admitted caring for his minor children ages 6 and 13, including taking them to school and preparing meals; Plaintiff used the computer and a smart phone, activities requiring functional use of his hands; and Plaintiff drives locally to his children's schools and medical appointments. The ALJ found that, overall, Plaintiff admitted to performing activities requiring functional use of his upper extremities, including his hands. R. 90. The ALJ noted that, while Plaintiff may benefit from others' willingness to perform most chores, the treatment record failed to indicate the symptom severity or degree of limitation generally alleged. *Id.*

Plaintiff contends that the ALJ "either minimized or outright ignored" evidence regarding his mistreatment by law enforcement. Pl.'s Br. at 21. The ALJ noted that Plaintiff confirmed he injured his left shoulder when the police were arresting him and that Plaintiff spent "considerable time during his testimony detailing how the police had mistreated him and how his doctors messed up his surgery." R. 90. The ALJ indicated that Plaintiff testified that he had difficulty raising his left arm overhead and denied the ability to bend. *Id.* It is clear the ALJ did not ignore this testimony. Plaintiff does not explain how the evidence required the ALJ to include more restrictions in the RFC assessment.

The ALJ explained that the overall medical evidence, Plaintiff's activities of daily living, and Plaintiff's testimony contradicted Plaintiff's statements about his symptoms. The fact that reasonable factfinders may reach different conclusions is not a reason to overturn the ALJ's credibility determination. The ALJ's conclusion is supported by substantial evidence, is not patently wrong, and does not necessitate remand.

**C. VE Testimony**

Plaintiff asserts that the ALJ erred in relying on the VE's testimony. At the hearing, the ALJ questioned the VE about the jobs that exist in the national economy that a hypothetical person with Plaintiff's RFC could perform. The VE testified that there would be jobs, including a copy machine operator, an inspector/hand packager, and an electrical accessories assembler position. R. 130.

Plaintiff maintains that the ALJ failed to provide an accurate summary of Plaintiff's circumstances and condition to the VE and that he improperly relied on the VE's "baseless and generalized conclusions." Pl.'s Br. at 25. "It is well-established that both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations

17

supported by the medical record." *Burmester*, 920 F.3d at 511 (internal quotation marks and citation omitted). But "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Simila v. Astrue*, 573 F.3d 503, 520–21 (7th Cir. 2009). In this case, the ALJ's hypothetical question to the VE mirrored the RFC assessment. Plaintiff has not challenged the ALJ's RFC assessment and has not indicated what additional limitations were required. In short, the ALJ did not err in formulating the hypothetical question he posed to the VE. Plaintiff also criticizes the jobs the VE testified Plaintiff could perform, including photocopy machine operator, inspector hand packager, and electrical accessories assembler, asserting that he is unable to perform them. But he offers no evidence to support his contention. In short, the ALJ did not err in relying on the VE's testimony.

**D. Due Process**

Plaintiff asserts that his due process rights were violated because he did not have an opportunity to a full hearing. Plaintiff asserts that he was not represented by counsel and that the ALJ cut his testimony short. To the extent Plaintiff asserts that he was denied due process because he was not represented at the hearing, his argument fails. Plaintiff appeared pro se at the administrative hearing, despite having the right to counsel pursuant to 42 U.S.C. § 405(a)(1) and 20 C.F.R. § 404.1700. In the Seventh Circuit, a pro se claimant may waive the right to representation, provided the claimant is advised of "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to twenty-five percent of past due benefits and required court approval of the fees." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (internal quotation marks and citation omitted). In this case, Plaintiff was adequately advised of his right to counsel. The agency sent Plaintiff numerous notices regarding his right to representation. *See* R. 505, 511, 527, 533.

Each notice contained a form entitled "Your Right to Representation." At an August 31, 2018, administrative hearing, the ALJ advised Plaintiff that he had a right to be represented by an attorney or a non-attorney. R. 143. Plaintiff stated that he understood his right to representation and requested more time to seek an attorney. R. 144–45. The ALJ granted Plaintiff's request and postponed the hearing. Plaintiff signed an acknowledgement form indicating that he had been advised that if he did not obtain a representative by the next hearing, he would need to be prepared to proceed without a representative. R. 526. Eight months later, Plaintiff returned to the scheduled hearing without a representative. The ALJ reminded Plaintiff of the earlier acknowledgement and proceeded with the hearing. R. 108–09. The ALJ did not err in proceeding with the hearing.

Plaintiff also asserts that the ALJ "cut off" his testimony and that he was not able to cross-examine witnesses. Pl.'s Br. at 26 (citing R. 129). At the hearing, the ALJ stated, "Sir, I'm very short on time now. Actually, I have another hearing starting in just a couple minutes. So if there's anything else you think I really need to know, this is the time to tell me. But I'm going to have to move on here pretty quick." R. 129. Plaintiff responded, "I'm disabled. And that's the only thing I have to say. If I was able to work, I would have been out there holding two or three jobs." *Id.* After the VE testified, the ALJ asked if there was anything else that Plaintiff thought the ALJ needed to know. R. 131. Plaintiff responded that he had nothing further. The ALJ also left the record open so that Plaintiff's fiancé could submit additional evidence. R. 132. Plaintiff does not indicate what additional testimony or evidence he would have provided at the hearing. The Court does not find that Plaintiff's due process rights were violated.

## CONCLUSION

For the reasons discussed above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of September, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge